UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY

DOCUMENT

ELECTRONICALLY FILED

DOC#:

DATE FILED: 11/21/19

---

ANDRE YOUNGBLOOD,

            Plaintiff,

        v.

CITY OF NEW YORK, DETECTIVE
LOUIS PENA #6992, OFFICER JESUS
SANCHEZ #5644, and C.O. T.J. #19297,

            Defendants.

---

No. 15-CV-3541 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Court Judge:

Plaintiff Andre Youngblood, proceeding *pro se*, brings this action pursuant to 42 U.S.C. §
1983. His allegations stem from his arrest, made pursuant to a warrant issued by a state
magistrate judge in South Carolina, on March 10, 2015, at which time Plaintiff was a patient at
St. Barnabas Hospital. In July 2017, the Court dismissed several of Plaintiff's claims pursuant to
Federal Rule of Civil Procedure 12(b)(6). Three of Plaintiff's claims survived: false arrest,
denial of a right to a fair trial, and deliberate indifference to serious medical needs. Following
the conclusion of discovery, the only remaining Defendants, Louis Pena and Jesus Sanchez,
moved for summary judgment. For the reasons stated below, Defendants' motion is granted in
its entirety.

# BACKGROUND[1]

## I. Events Prior to Plaintiff's Arrest

On March 5, 2015, Plaintiff Andre Youngblood sustained a deep gash to his right hand due to a work-related accident. Plaintiff was admitted to St. Barnabas Hospital in the Bronx, New York, where he immediately received treatment, including stiches and antibiotics, for the wound. Soon after, the medical staff determined that he had suffered a flexor tendon rupture, which would require surgery to repair. Plaintiff was also diagnosed with pneumonia.

Plaintiff remained in the hospital for several days. He was initially scheduled to have surgery on his hand "for exploration and flexor tendon mechanism repair" on March 6. Ex. M at DEF022. However, because Plaintiff was taking antibiotics for pneumonia, his doctor decided that the best course of action was to postpone Plaintiff's surgery, first to March 8 and then to an unidentified time in the near future. *See* Ex. M (St. Barnabas Hospital Medical Records) at DEF028 ("Dr. Patel . . . was comfortable with his [pneumonia] improving appropriately [until] he could tolerate the surgery[.]"); Ex. M at DEF038 (postponing Plaintiff's surgery again "for medical clearance"). The medical records reflect that Plaintiff was told his "surgery may safely

---

[1] The following facts are uncontroverted unless otherwise noted. Because Plaintiff did not file a Rule 56.1 Statement, the facts are drawn primarily from Defendants' Rule 56.1 Statement and the exhibits filed with their summary judgment motion. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2005) (*pro se* litigants are not exempt from complying with the local rules); *see also* Dkt. 154 (Defendants' Rule 56.2 Notice sent to Plaintiff).

Nonetheless, the Court has not presumed the facts in Defendants' Rule 56.1 Statement to be admitted. "[W]here a *pro se* plaintiff fails to submit a proper Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali v. One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009). The Court thus construes Plaintiff's two letters – filed on July 1 and 8, 2019 – as submissions in opposition to the motion and considers the documentary evidence attached to Plaintiff's July 1 letter. *See* Dkt. 157, 158. Accordingly, it will "conduct[] an independent review of all of the evidence submitted by both parties, so as to ascertain whether the record actually reveals any material disputed issues of fact." *Wali*, 678 F. Supp. 2d at 178. Only where Defendants' "Local Rule 56.1 statement is not contradicted by the court's review of the record" are their "assertions . . . admitted as a matter of law." *Toliver v. Office-Dep't of Corr. NYC*, No. 10-CV-5354, 2013 WL 3783727, at *2 n.1 (S.D.N.Y. July 9, 2013).

be delayed[.] [T]he risk of surgery without medical optimization did not outweigh the benefit of immediate repair." Ex. M at DEF038.

In light of this delay, St. Barnabas medical staff tried to discharge Plaintiff on March 9. Plaintiff was told "many times [that] he is at a higher risk from . . . infections[]" in the hospital, Ex. M at DEF042, and thus "it's best for [him] to get discharged, and go home," Ex. B, Pl.'s Dep. 76:20-23. Plaintiff, however, "became angry and aggressive and refused the idea of . . . leaving the hospital." Ex. M at DEF042; *see also* Ex. M at DEF044 ("Discussed with [patient] the risk of staying in the hospital but he is refusing to discharge at the moment."); Ex. B, Pl.'s Dep. at 76:16, 77:10-11 (acknowledging that he "refused to go" when the doctor suggested discharge).

## II. Plaintiff's Arrest

On March 10, 2015, Plaintiff was arrested at St. Barnabas Hospital pursuant to a warrant issued in South Carolina two months earlier. On January 14, 2015, the stepdaughter of Plaintiff's brother alleged that Youngblood had attempted to sexually assault her. *See* Ex. C (Incident Report) at DEF421. The incident report identified the suspect as "Andri Shere Youngblood," an African American male who was 5'6 and 215 pounds.[2] Ex. C at DEF421. The next day, a magistrate judge issued a warrant for "Andri Youngblood" for the offense of "criminal sexual conduct with [a] minor." *See* Ex. D (Arrest Warrant) at DEF001. The U.S. Marshals in South Carolina identified the suspect as a "non-compliant registered sex offender from the state of New York," who "has not registered since being incarcerated by NYC Docs

---

[2] In the "Narrative" section of the incident report, the suspect's name is spelled "Mr. Andre Youngblood." *See* Ex. C at DEF421.

[sic] in 2007." Ex. F (U.S. Marshals Service Report of Investigation from Feb. 23, 2015) at DEF446.

Several searches for the suspect in South Carolina were unsuccessful. *See* Ex. F at DEF446. But on February 16, 2015, the Marshals received "an anonymous tip . . . that the subject is currently hiding out in the Bronx, NY area with family." Ex. F at DEF446. Consequently, the Marshals contacted the New York/New Jersey Fugitive Task Force (the "Fugitive Task Force") requesting assistance "with apprehending the subject" identified in the warrant. Ex. F at DEF446.

On March 10, 2015, the Fugitive Task Force, of which Defendant Detective Louis Pena was a part, began its search for the suspect. It first went to the Bronx address provided in the anonymous tip, where an unknown individual directed the officers to St. Barnabas Hospital. *See* Ex. F at DEF446. Once at St. Barnabas Hospital, officers went to Plaintiff's hospital room. Upon entering the room, the officers first approached the other patient in Plaintiff's hospital room and asked what his name was. That man's name, however, did not match the one on the warrant. The officers then approached Plaintiff and asked for his name, to which he responded "Andre Youngblood." Plaintiff was then arrested and discharged from the hospital. Plaintiff insists that the warrant was not intended for him.

Medical records from the day of Plaintiff's discharge confirm that the staff previously tried to discharge him because "ideally we would like him to complete his [pneumonia treatment] and then we can schedule his tendon repair in the near future." Ex. M at DEF412. A doctor also reported that, at the time of his discharge, "[h]is incisions [were] well healed and [there was] no drainage or evidence of infection." Ex. M at DEF412.

4

## III. Subsequent Detention & Medical Treatment

Following his arrest and discharge from St. Barnabas Hospital, Plaintiff was transferred to the 42nd Precinct and then to Bronx Central Booking. Defendant Jesus Sanchez was the E.M.T. assigned to evaluate Plaintiff while he was at Bronx Central Booking. Sanchez noted on the New York Police Department Medical Treatment of Prisoner Form that Plaintiff had a "cut on right hand/old injury/seizures" but that he refused medical aid from Sanchez. Ex. L at DEF005 (NYPD Medical Treatment of Prisoner Form).

Later that day, Plaintiff was arraigned. He refused to waive extradition to South Carolina where he was charged with "the crime of rape, criminal sexual misconduct of a minor." Ex. Q (Fugitive Affidavit) at DEF397. He was then transferred to the Vernon C. Bain Correctional Center ("VCBC"), where his hand was evaluated and treated the next day. *See* Ex. R at DEF235, 249; Ex. B, Pl.'s Dep. 101:21-22. Plaintiff was detained at VCBC for approximately a month before being transferred to Rikers Island. *See* Ex. B, Pl.'s Dep. 103:8-9. During his time at VCBC and Rikers Island, Plaintiff continuously received treatment, including wound care, antibiotics, and therapy, for his hand. *See* Ex. B, Pl.'s Dep. 103:1-3; Ex. R at DEF142-DEF249. He was also referred to Bellevue Hospital for hand surgery; however, he did not have surgery while in custody of the New York City Department of Correction. *See, e.g.*, Ex. R at DEF144; Ex. B, Pl.'s Dep. 102:13-19.

On May 13, 2015, Plaintiff was indicted in the District of South Carolina for failing to register as a sex offender between approximately June 2014 and January 2015. A request was made to remove him to South Carolina. *See* Ex. S (Indictment) at DEF 432; Ex. T (Affidavit in Support of Removal) at DEF434-DEF436; Ex. B, Pl.'s Dep. 103:17-18. After a hearing was held to confirm that Plaintiff was the suspect wanted in South Carolina, Plaintiff was removed to the

5

District of South Carolina where he plead guilty on July 18, 2016 for failing to register as a sex offender. *See* Ex. V at DEF427. He was sentenced to ten years in prison and currently remains in the custody of the Federal Bureau of Prisons ("BOP"). Since being in BOP custody, Plaintiff has had three surgeries on his hand.[3] *See* Pl.'s Ltr. (Dkt. 157).

## IV. Procedural History

On April 28, 2015, Plaintiff filed the present action against Defendants Pena, Sanchez, and a C.O., whom Plaintiff identified only as "T.J."[4] Plaintiff filed an amended complaint on June 16, in which he added the City of New York (the "City") as a defendant. Defendants City and Pena subsequently moved to dismiss Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(c). On June 27, 2016, Judge Analisa Torres, to whom the case was initially assigned, granted in part and denied in part their motion to dismiss. Judge Torres dismissed all claims brought against the City pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). As to Defendant Pena, Judge Torres denied his motion to dismiss as to Plaintiff's false arrest claim, but dismissed Plaintiff's claims for malicious abuse of process, excessive force, deliberate indifference to serious medical needs, and violations of the First Amendment

---

[3] In his opposition briefing, Plaintiff states that he has had six surgeries on his right hand. *See* Pl.'s Ltr. (Dkt. 157). However, in his deposition, Plaintiff testified that he had three surgeries. *See* Ex. B at 120:19-22. The medical records filed by Plaintiff also establish that he only had three surgeries in BOP custody. *See* Pl.'s Ltr (Dkt. 157) (June 12, 2018 report stating: "The patient states he had 3 surgeries on his right hand for flexor tendon reconstruction for his right ring finger in 2016 approximately 1 year after his initial injury.").

[4] In the initial complaint, Plaintiff referred to the unidentified C.O. as both "T.I." (in the caption) and "T.J." (in the rest of the complaint). In the amended complaint, Plaintiff referred to the unidentified C.O. as "T.I." As it previously did in its July 2017 Opinion, the Court will refer to this Defendant as "T.J.." *See* July 24, 2017 Op. at 3 n.1.

and the Fourteenth Amendment Equal Protection Clause. Judge Torres granted Plaintiff leave to amend his excessive force and deliberate indifference claims.[5]

In November 2016, Plaintiff filed a second amended complaint ("SAC") – the operative complaint here – alleging six claims pursuant to § 1983: (1) malicious abuse of process, (2) denial of a right to a fair trial, (3) excessive force, (4) deliberate indifference, (5) violation of the Equal Protection Clause, and (6) *Monell* municipal liability. The City and Pena again moved to dismiss Plaintiff's claims, this time pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(f).[6] This Court granted Defendants' motion as to the majority of Plaintiff's claims. It rejected Plaintiff's claim of municipal liability, thus dismissing the City from the action. But it denied Pena's motion to dismiss as to two claims: denial of a constitutional right to a fair trial and deliberate indifference to serious medical needs.

Additionally, the Court noted that Plaintiff had yet to serve Sanchez or "T.J." As for "T.J.," the Court required Plaintiff to provide identifying information for this defendant by August 21, 2017, warning that failure to do so might result in dismissal of his claim against "T.J." pursuant to Federal Rule of Civil Procedure Rule 41(b). To date, Plaintiff has not provided this information. Accordingly, the Court dismisses Plaintiff's claims against "T.J." with prejudice.[7]

---

[5] On August 1, 2016, Plaintiff filed a second action (No. 16-CV-6100), referred to in the Court's July 2017 Opinion as "Youngblood II." Plaintiff's claims in Youngblood II involved the same facts at issue here, as well as nearly identical claims against the same Defendants. That action was consolidated with this one and later dismissed with prejudice in the Court's July 2017 Opinion. *See* July 24, 2017 Op. at 12.

[6] Defendants did not move to dismiss Plaintiff's false arrest claim.

[7] While "a pro se litigant's claim should be dismissed for failure to prosecute 'only when the circumstances are sufficiently extreme,'" *Baptiste v. Sommers*, 768 F.3d 212, 217 (2d Cir. 2014) (citation omitted), those circumstances are present here. This litigation has been ongoing for almost four years, yet Plaintiff has never provided any information to the Court or the City to identify "T.J." Indeed, Plaintiff did not do so even after the Court explicitly warned him a year ago that this might lead to dismissal of

The Court also ordered the Marshals to immediately serve Defendant Sanchez, who had been identified several months earlier by the City as "an EMT with the name Jesus Sanchez and shield number 5644 identified on plaintiff's injury to inmate form from the date of the incident," with the SAC. Dkt. 62. The Court, however, prohibited Plaintiff from bringing the previously dismissed claims against Sanchez. Plaintiff served Sanchez on November 13, 2017.

Following the Court's July 2017 Order, the parties conducted discovery on the three remaining claims: (1) false arrest; (2) denial of a constitutional right to a fair trial; and (3) deliberate indifference to serious medical needs. Now before the Court is Defendant Pena and Defendant Sanchez's motion for summary judgment.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations omitted). In deciding such a motion, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants, particularly where motions for summary judgment are concerned." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (per curiam) (citation and alteration

---

these claims. Because "T.J." has not been served and had no opportunity to participate in this litigation, the "circumstances are sufficiently extreme" to warrant dismissal. *Id.*

8

omitted). Thus, "[c]ourts read the pleadings, briefs, and opposition papers of pro se litigants 'liberally and interpret them to raise the strongest arguments that they suggest.'" *Rivera v. Goulart*, No. 15-CV-2197 (VSB), 2018 WL 4609106, at *3 (S.D.N.Y. Sept. 25, 2018).

## DISCUSSION

### I. False Arrest & Denial of Fair Trial Claims Against Sanchez Fail for Insufficient Personal Involvement

Sanchez contends that "[t]here are no facts on the record to indicate that [he] had any personal involvement in the alleged constitutional violation," and thus he cannot be liable under § 1983. Defs.' Memo. at 16. The Court agrees, but only as to two of Plaintiff's three claims.

"Section 1983 liability requires personal involvement." *Blyden v. Mancusi*, 186 F.3d 252, 271 (2d Cir. 1999). Therefore, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006). Personal involvement has been "construed . . . to mean direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Whether a defendant was sufficiently personally involved is a question of fact. *See Farrell*, 449 F.3d at 484.

Plaintiff's only allegation involving Sanchez is that he checked on Plaintiff while he was detained at Bronx Central Booking after his arrest and discharge from St. Barnabas Hospital. Plaintiff does not dispute that, even though Sanchez approached him there, Sanchez was not present at St. Barnabas Hospital when Plaintiff was arrested or at all involved in Plaintiff's criminal proceedings following his arrest. There is thus no factual dispute that this was

9

Sanchez's only interaction with Plaintiff – and a very brief one at that. *See* Defs.' Rule 56.1 Stmt. ⁋ 31; Ex. L at DEF005.

These facts do not demonstrate sufficient personal involvement for Sanchez to be liable under § 1983 for Plaintiff's claims of false arrest or denial of a right to fair trial. Nothing in the record suggests that Sanchez was personally involved with, for instance, the execution of the warrant, locating and arresting Plaintiff at St. Barnabas, or the alleged disclosure of improper information to prosecutors after Plaintiff's arrest. By contrast, albeit a close question, the Court concludes that there are sufficient facts to find Sanchez at least sufficiently involved in the circumstances surrounding Plaintiff's health evaluation on March 10 for him to be liable for deliberate indifference under § 1983, if the elements are met.

## II. False Arrest Claim Against Pena

Plaintiff alleges that he was falsely arrested on March 10, 2015 at St. Barnabas Hospital. He does not dispute that he was arrested pursuant to a warrant, but argues that he was not the individual described in the warrant because it had the "wrong name with no photo." SAC; *see also* Pl.'s Ltr. (Dkt. 157).

A false arrest claim under § 1983 incorporates the elements of the state law where the arrest took place – here, New York. *See Hui Ping Wang v. United States*, No. 06-CV-3050, 2007 WL 9710550, at *5 (E.D.N.Y. Dec. 28, 2007). "The elements of a claim for false arrest under New York law are that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Sforza v. City of New York*, No. 07-CV-6122, 2009 WL 857496, at *13 (S.D.N.Y. Mar. 31, 2009).

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). Probable cause exists when "the officer[s] ha[ve] 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *United States v. Delossantos,* 536 F.3d 155, 158 (2d Cir. 2008) (citation omitted). The existence of a warrant generally establishes probable cause for an arrest. *See Martinez v. City of New York*, 340 F. App'x 700, 701-02 (2d Cir. 2009); *Galarza v. Monti*, 327 F. Supp. 3d 594, 603 (S.D.N.Y. 2018) (explaining that the "[o]fficer . . . had probable cause to arrest the plaintiff based on the outstanding warrant").

Here, there is no factual dispute that Pena had a warrant for Plaintiff's arrest and thus probable cause to arrest Plaintiff on March 10 at St. Barnabas Hospital. The Fugitive Task Force, which Pena was part of, arrested Plaintiff pursuant to the warrant signed by a magistrate judge in South Carolina on January 15, 2015. *See* Ex. D at DEF001. Plaintiff has not disputed that the warrant was facially valid. The warrant was, therefore, sufficient to "create[] a presumption that probable cause existed . . . rebuttable only though proof of fraud, perjury or the misrepresentation or falsification of evidence." *Artis v. Liotard*, 934 F. Supp. 101, 103 (S.D.N.Y. 1996). Although Plaintiff alleges that Pena "created false evidence of [a] warrant," no evidence supports that. The undisputed fact that Pena had a valid warrant for Plaintiff's arrest is alone enough to defeat his false arrest claim.

Nonetheless, Plaintiff seems to argue that this was a false arrest because the warrant had the "wrong" name. Pl.'s Ltr. (Dkt. 157). This argument has no factual or legal support. Factually, this argument is unpersuasive because the name was not wrong, but only misspelled.

Plaintiff's name is "Andre Youngblood," and the warrant was for a man named "Andri Youngblood." As such, Plaintiff's argument hinges on the difference of one letter – an "i" instead of an "e" in the first name – even though his name was spelled correctly in the narrative section of the incident report. Moreover, in his deposition, Plaintiff admitted to knowing that the warrant was issued as a result of allegations made by his "brother's stepdaughter [who] claimed that there was some sexual misconduct with [him] in South Carolina." Ex. B, Pl.'s Dep. at 101:3-8. Indeed, Plaintiff ultimately plead guilty in South Carolina for failing to register as a sex offender while living there. These admissions severely undercut Plaintiff's argument that there was any mistaken identity at all.

But even if the Court assumed *arguendo* that Plaintiff's allegations of mistaken identity had some basis and that the warrant was erroneously used to arrest Plaintiff, the false arrest claim against Pena would still fail. Courts in this circuit have repeatedly held that even where a plaintiff can establish an actual case of mistaken identity, there is no constitutional violation so long as there was probable cause for the arrest at the time. *See, e.g., Francois v. United States*, 528 F. Supp. 533, 536 (E.D.N.Y. 1981) ("A false arrest due to mistaken identity pursuant to a valid warrant does not give rise to a constitutional violation."); *Johnson v. City of New York*, No. 15-CV-8195, 2017 WL 2312924, at *11 (S.D.N.Y. May 26, 2017) ("Actual probable cause existed to arrest Plaintiff, then – notwithstanding that she turned out not to be the subject of the Warrant – as long as the arresting officers (and the Individual Defendants) 'reasonably believed that the arrestee was that person.'" (citation omitted)). In *Martinez v. City of New York*, for instance, the Second Circuit denied the claim of a plaintiff, who was mistakenly arrested pursuant to a warrant, because the fact that "the physical description in the outstanding warrant differed in skin tone, height and weight from plaintiff's physical appearance" were

"discrepancies . . . too minor to preclude a finding of probable cause." 340 F. App'x at 701. Nor does it matter that at the time of the arrest Plaintiff claimed his innocence as Pena had no duty to "to explore and eliminate every plausible claim of innocence before making an arrest." *Sforza*, 2009 WL 857496, at *13 (citation omitted); *see also Panetta v. Crowley*, 460 F.3d 388, 395–96 (2d Cir. 2006) ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause.").

Here, Pena had "reasonably trustworthy information of facts and circumstances" to believe the warrant was intended for Plaintiff. *Delossantos,* 536 F.3d at 158. Plaintiff gave Pena a name that matched the one on the warrant. *See* Ex. B, Pl.'s Dep. at 90:16-18 (stating that he told the Fugitive Task Force his name was "Andre Youngblood"). Pena was not unreasonable in disregarding the single letter misspelling between "Andri" and "Andre." *See Johnson*, 2017 WL 2312924, at *11 (describing a difference in the spelling of plaintiff's actual name – Millicent Johnson – and the one on the warrant – Millencent Johnson – as "undeniably slight"). Pena also was aware that the suspect had listed aliases, including "Andre Shere Youngblood." *See* Ex. G at DEF451. And notably, Plaintiff has not argued that the warrant's physical description of the suspect, *e.g.*, eye color and height, not match him. *See Hill v. California*, 401 U.S. 797, 802-03 (1971) (holding that an officer had probable cause to arrest a person "who fit the description" of the suspect).

Accordingly, there is no material dispute of fact at to whether Pena had probable cause to arrest Plaintiff. Because "probable cause is a complete defense" to a false arrest claim, *Little v. City of New York*, 487 F. Supp. 2d 426, 439 (S.D.N.Y. 2007), Pena is therefore entitled to summary judgment on this claim.

### III. Denial of Fair Trial Claim Against Pena

Plaintiff raises a related argument that he was denied a right to a fair trial because Pena "forwarded false evidence and false information of the wrong name with no photo on [the] warrant to prosecutors." SAC. He also alleges that Pena "withheld exculpatory evidence," "misrepresented and falsified evidence throughout all phase of the criminal proceedings," and "created false evidence of [a] warrant." SAC.

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). Unlike a false arrest claim, "a Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the Section 1983 plaintiff." *Garnett v. Undercover Officers C0039*, 838 F.3d 265, 277-78 (2d Cir. 2016); *see also Harris v. City of New York*, 222 F. Supp. 3d 341, 351 (S.D.N.Y. 2016) (a denial of a right to a fair trial claim is actionable even if there was no trial).

The Court grants summary judgment to Pena on this claim as well. In brief, there is no support in the record for Plaintiff's assertion that Pena created false information or made false statements about Plaintiff that he shared with prosecutors. As an initial matter, Pena could not have "created false evidence of [a] warrant" because he had no involvement with the issuance of the warrant in South Carolina. SAC. As explained above, although probable cause is not a defense here, Pena was reasonable – and correct – in believing that Plaintiff was the person described in the warrant when he arrested him. Finally, there is nothing in the record even

14

addressing what statements Pena made to prosecutors after Plaintiff's arrest. The proceedings that followed Plaintiff's arrest only further confirm the accuracy of whatever information was shared with prosecutors. For instance, on June 23, 2015, before being extradited to the District of South Carolina, Plaintiff was provided a hearing to ensure that he was the person wanted in South Carolina. The judge confirmed that Plaintiff was that person. *See* Ex. T at DEF434-DEF436.[8]

Therefore, construing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the record is nonetheless devoid of anything that could create a factual dispute as to whether Pena created and shared false information about Plaintiff.

## IV. Deliberate Indifference Claim Against Pena & Sanchez

Lastly, Plaintiff contends that both Defendants were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment. In the SAC, Plaintiff alleges that he was "forcibly discharged from medical care" at St. Barnabas Hospital and "denied medication" as a result of "Pena conspir[ing] with Dr. Raja[,] a non-party[,] to forge medical release documents." SAC. In his opposition to summary judgment, Plaintiff repeats this argument, stating that "[D]efendants lie[d] to my doctor and sa[id] they [were] going to take me to court and bring me back so they want me discharge[d] right away." Pl.'s Ltr. (Dkt. 157). Discharge was a risk to his health, Plaintiff asserts, because he "was suppose[d] to go in [to] surger[y] the

---

[8] In his opposition to Defendants' first motion to dismiss, Plaintiff argued that Pena fabricated evidence because Pena told the judge at his arraignment "that he had checked and he had the 'right guy.'" Pl.'s Ltr. (Dkt. 37). Plaintiff has not raised that argument in opposing summary judgment. Even so, there is nothing in the record to show Pena made this statement in court and, if he did, that he did not check or have the "right guy." At this stage, a "nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth 'concrete particulars' showing that a trial is needed." *Hollman v. County of Suffolk*, No. 06-CV-3589, 2011 WL 280927, at *3 (E.D.N.Y. Jan. 27, 2011).

15

next day." Pl.'s Ltr. (Dkt. 157). Yet, despite Pena's alleged promise to the doctor, Plaintiff was never brought "back after get[ting] arraign[ed]." Pl.'s Ltr. (Dkt. 158).

In 2015, the Supreme Court's decision in "*Kingsley* [*v. Hendrickson*, 135 S. Ct. 2466] altered the standard for deliberate indifference claims under the Due Process Clause" for pre-trial detainees. *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017). As the Second Circuit explained, "The Court rejected the requirement that, for such claims, a pretrial detainee establish a state of mind component to the effect that the official applies the force against the pretrial detainee 'maliciously and sadistically to cause harm.'" *Id.* at 21. Although *Kingsley* involved an excessive force claim, *Darnell* subsequently read *Kingsley* to apply "beyond the excessive force context." *Id.* at 35-36. As such, courts in this district have applied this new standard to a pretrial detainee's claim of deliberate indifference to medical needs. *See, e.g.*, *Dawkins v. Copeland*, No. 17-CV-9926, 2019 WL 1437049, at *8 (S.D.N.Y. Mar. 31, 2019).

Accordingly, to survive summary judgment on his deliberate indifference claim, Plaintiff must show that he "had a serious medical condition and that it was met with deliberate indifference." *Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018). As to the first prong, "[t]here is no specific yardstick by which courts are to measure the seriousness of a [plaintiff's] medical need." *Butler v. Suffolk Cty. Corr. Facility Med. Ctr.*, No. 11-CV-1463, 2013 WL 1193065, at *6 (E.D.N.Y. Mar. 22, 2013). Factors to consider include "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment and treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* The second prong, as to deliberate indifference, now also demands an objective assessment, such that a "pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or

recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

## A. Plaintiff's Medical Need

As an initial matter, the Court rejects Defendants' contention that, based on the evidence, no reasonable jury could find Plaintiff's injury sufficiently serious. Rather, the evidence, particularly the medical records from St. Barnabas Hospital, establish that Plaintiff's hand injury was significant. Although Plaintiff was admitted to St. Barnabas with a "hand laceration," Plaintiff was, at the time, "[u]nable to feel or move the 4th finger, partially able to flex and extend the 5th digit, blunted sensation." Ex. M at DEF010, DEF013. "[A]fter vigorous irrigation," "[h]is skin was closed" with sutures and "he was started on empiric antibiotics for the traumatic laceration with possible contamination." Ex. M at DEF028.

In any event, it is a mistake to focus only on the laceration, as Defendants do. As a result of the laceration, Plaintiff was diagnosed with a ruptured flexor tendon that required surgery to avoid potential nerve damage. *See* Ex. M at DEF028, DEF038, DEF042. Plaintiff would eventually have three surgeries between 2015 and 2016, in addition to undergoing therapy and being prescribed pain medication in the weeks and months after. *See* Ex. R at DEF153 (showing that Plaintiff attended therapy on April 22, 2015); Pl.'s Ltr (Dkt. 157) (exhibits detailing his surgeries between 2015 and 2016); Ex. R. at DEF241 (showing that Plaintiff "came complaining of hand pain"). In the years following the injury, Plaintiff continued to have "pain and stiffness in his right ring finger . . . which [had] not improved over time." Pl.'s Ltr. (Dkt. 157) (Final Report dated June 12, 2018). Thus, contrary to Defendant's assertion, Plaintiff suffered more than an "[a]brasion[], laceration[], cut[], [or] bruise[]," and the facts here are distinguishable

17

from those in the cases cited by Defendants. *See* Defs.' Memo. at 9-10 (citing, *e.g.*, *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 311 ("[A] cut finger, even where skin is 'ripped off,' as the plaintiff alleges, does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief.")).

Certainly then, Plaintiff suffered an injury that "a reasonable doctor or patient would perceive . . . as important and worthy of comment and treatment," as well as one that "significantly affects daily activities" and causes "chronic and substantial pain." *Butler*, 2013 WL 1193065, at *6. It is in fact "settled Second Circuit doctrine . . . that chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis." *Vining v. Dep't of Corr.*, No. 12-CV-3267, 2013 WL 2036325, at *4-5 (S.D.N.Y. Apr. 5, 2013); *cf. Goodwin v. Kennedy*, No. 13-CV-1774, 2015 WL 1040663, at *12 (E.D.N.Y. Mar. 10, 2015) (explaining that the fact that "[p]laintiff never sought further treatment for his injuries. . . [may] undermine[] the notion that the injuries were 'serious' and tends to show that his injuries were not 'chronic'"). This, at minimum, creates a genuine factual dispute as to the first prong of *Kingsley*.

### B. Deliberate Indifference

Although Plaintiff can demonstrate he had a serious medical condition, there is no evidence that either Pena or Sanchez were deliberately indifferent to that condition.

Plaintiff contends that Pena "should have known" that discharging him from St. Barnabas Hospital on March 10 and failing to return him that day "posed an excessive risk to [his] health." *Darnell*, 849 F.3d at 35. But this argument is contrary to the evidence in the record, which clearly establishes that there was no risk, let alone an "excessive risk," to discharging Plaintiff from the hospital that day. *Id.* According to the medical records, on at least two occasions prior

18

to Plaintiff's arrest, doctors told Plaintiff that the surgery was not immediately necessary, even

recommending against having surgery at that time because "ideally we would like [him] to

complete his [pneumonia treatment] and then we can schedule his tendon repair in the near

future." Ex. M at DEF412; *see also* Ex. M at DEF038 ("[T]his surgery may safely be delayed[;]

the risk of surgery without medical optimization did not outweigh the benefit of immediate

repair.").

Because the surgery could be delayed without risk, doctors tried to discharge Plaintiff

twice in the days before his arrest. Noting that "[h]is skin has been closed since initial exam and

he has no evidence of infection from this injury," the doctor raised the possibility of discharge

with Plaintiff on March 8, but Plaintiff "became angry and aggressive and refused the idea of

leaving the hospital." Ex. M at DEF042. One day later, the doctor again tried unsuccessfully

discharge Plaintiff:

> We explained ideally we would like him to complete his [antibiotics] and then we can
> schedule his tendon repair in the near future. He continued to aggressively refuse. Today he
> will be sent home with ABX recs per medicine and I will continue his Depakote TID as per
> Neurology recommendations.

Ex. M at DEF411. Plaintiff even admitted these facts in his deposition. *See* Ex. B, Pl.'s Dep.

76:13-25, 77:1-25.

Therefore, Plaintiff's allegation that "defendants lie[d] to my doctor" in promising to

return him to the hospital after his arraignment carries no force here. Pl.'s Ltr. (Dkt. 157). Not

only is it a conclusory allegation that this statement was even made, which cannot be relied on at

summary judgment, but there is also no evidence that Plaintiff needed to return to the hospital

after his arraignment. *Hollman*, 2011 WL 280927, at *3. While Plaintiff did tell "the judge" at

his arraignment "that I'm in pain and I need some medical assistance," Plaintiff also admitted

that he received immediate medical care upon entering VCBC that day. Ex. B, Pl.'s Dep. 98:20-

19

21, 101:23-25, 102:1. Thus, while the record establishes that Plaintiff required follow-up care for his hand injury, there is no evidence that Plaintiff needed to remain in the hospital; that his injury worsened in light of his discharge on March 10; or that he did not receive prompt medical care after his arraignment. *See Ferguson v. Cai*, No. 11-CV-6181 (PAE), 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) ("Where a claim concerns the temporary delay or interruption in the provision of medical treatment . . . then 'the focus shifts to the particular risk of harm faced by a prisoner due to the challenged *deprivation of care*, rather than the prisoner's underlying medical condition in the abstract.'" (citation omitted)).[9]

Based on this record, no reasonable person could have thought that discharging Plaintiff on March 10 posed a risk to his health. As such, there is no genuine dispute of fact that Pena did not act with deliberate indifference and is thus entitled to summary judgment on this claim.

For similar reasons, Plaintiff's deliberate indifference claim against Sanchez also fails. Sanchez's only interaction with Plaintiff was his brief attempt to evaluate Plaintiff while he was detained at Bronx Central Booking. Indeed, Sanchez was not present at St. Barnabas Hospital when Plaintiff was arrested nor privy to the decision to discharge Plaintiff. Sanchez thus cannot be liable for any resulting harm – if there was any – due to the alleged forcible discharge. Plaintiff, moreover, has failed to show that he was deprived of necessary medical assistance while detained at Bronx Central Booking or that he needed to be promptly returned to the hospital. Without that evidence, the Court cannot conclude that Sanchez knew or should have known that failing to provide Plaintiff with medical assistance posed an excessive risk to his

---

[9] To the extent Plaintiff argues deliberate indifference based on the fact that he did not have hand surgery while in DOC custody, the Court need not consider that here. As Defendants point out, "[P]laintiff fails to name any prison officials or medical professional within DOC" responsible for this delay. Defs.' Memo. at 12. Pena and Sanchez cannot be liable for that delay because they had no control, let alone involvement, with Plaintiff at any point after he was transferred to DOC custody on March 10.

health. If anything, Plaintiff's refusal of any medical care while at Bronx Central Booking is directly contrary to the suggestion that Sanchez "knew, or should have known, that [Plaintiff's] condition posed an excessive risk to [his] health or safety." *Darnell*, 849 F.3d at 35; *see* Ex. L at DEF005. Sanchez, therefore, is also entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' summary judgment motion. The Clerk of Court is respectfully directed to terminate the motion at docket entry 151, and close the case.

Dated:    November 21, 2019
           New York, New York

                                       RONNIE ABRAMS
                                       United States District Judge